IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| Exzerra Lashawn Williams, | ) | C/A No.: 1:13-70-TMC-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

     This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB").[1] The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

---

[1] Plaintiff also filed an application for Social Security Income ("SSI") (Tr. at 98–101); however, her application was denied on July 15, 2009, because her resources exceeded the regulatory limits (Tr. at 47–50). Plaintiff does not challenge the denial of her SSI application.

I.    Relevant Background

A.    Procedural History

On July 6, 2009, Plaintiff filed an application for DIB in which she alleged her disability began on August 2, 2004.  Tr. at 104–107.  Her application was denied initially and upon reconsideration.  Tr. at 42–43.  On June 10, 2011, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Richard L. Vogel.  Tr. at 28–41 (Hr'g Tr.).  At the hearing, Plaintiff sought a closed period of disability from August 2, 2004, through January 21, 2010.  Tr. at 12.  She also requested reopening her prior application for benefits filed on July 28, 2005, which alleged the same onset date and was denied on July 21, 2005.  *Id.*  The ALJ issued an unfavorable decision on June 23, 2011, finding that Plaintiff was not disabled within the meaning of the Act.  Tr. at 12–23.  The ALJ denied Plaintiff's request to reopen her prior application and, in light of the prior denial of benefits, found that the relevant time period was July 22, 2005, to January 21, 2010.  Tr. at 13.  Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review.  Tr. at 1–3.  Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on January 5, 2013.  [Entry #1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 44 years old at the time of the hearing.  Tr. at 30.  She completed a Bachelor of Science degree in education at the College of Charleston.  Tr. at 32, 479.  Plaintiff has past relevant work as a preschool teacher, guest service representative,

manufacturing technician, discipline records clerk, manufacturing technician, retail team leader, and account manager. Tr. at 168. During the time period at issue, Plaintiff continued to work, but her work did not rise to the level of substantial gainful employment. Tr. at 14–15. From September 2005 through October 2005, Plaintiff worked full time as an administrative assistant for Gregory West Ashley and stopped working when she found out she could return to her previous job at Carolina National Logistics. Tr. at 142. From November 2005 through February 2006, Plaintiff worked eight hours a day for Carolina National Logistics as an account manager, but ultimately stopped working because of her medical condition. Tr. at 136. In March 2006, Plaintiff worked as a tutor for Educate Operating Company, but only worked for one week because of her medical condition. Tr. at 137. Beginning in 2006 and through the end of the relevant time period, Plaintiff worked 10 hours a week as an administrative assistant for Holy Light Miracle Temple. Tr. at 130.

2. Medical History

Plaintiff was admitted to the Medical University of South Carolina ("MUSC") from August 2, 2004, to August 12, 2004, following a motor vehicle accident in which she was an unrestrained driver who was ejected from the vehicle. Tr. at 286. She was found lying next to the vehicle unresponsive. *Id.* She was intubated and admitted to the ICU. *Id.* After being weaned from the ventilator, she was transferred to a regular floor. *Id.* Tr. at 290. At discharge, Plaintiff was able to consistently follow commands, tolerate a modified dysphagia diet, and work with physical therapy. Tr. at 286. Discharge diagnoses included closed head injury, nondisplaced right zygomatic fracture, greater

3

wing of sphenoid fracture, and right temporal bone fracture.  Tr. at 286–87.  She was transferred to Health South Rehabilitation ("Health South").  Tr. at 287.

Plaintiff was discharged from Health South on August 27, 2004.  Tr. at 285, 297–99.  Records note that she had cleared significantly from a mental status/cognitive standpoint.  Tr. at 297.  She was subsequently seen for three sessions for memory and word retrieval.  Tr. at 254.  At the discretion of the therapist, she was discharged from therapy on September 7, 2004.  *Id.*  The discharge assessment indicates that her specific naming was 80%, short term memory was 78%, and working memory was 64%.  *Id.*  She was later discharged from physical therapy with increased shoulder range of motion, decreasing pain, and overall improved strength and endurance.  Tr. at 250.

In follow up with neurosurgery on October 6, 2004, Plaintiff had no complaints.  Tr. at 284.  She weighed 266 pounds; had normal gait, reflexes, sensation, and strength; and had a normal range of motion in the neck.  *Id.*  She was judged to have recovered well from the skull fracture and was released to return to work.  *Id.*

On October 25, 2004, Plaintiff complained to Dr. Donald Hanna of Carolina Family Medicine of headaches and neck pain that began "weeks ago."  Tr. at 366–67.  Dr. Hanna's examination was notable for a tender left shoulder, limited range of motion of the left shoulder, and neck pain.  Tr. at 367.  The doctor noted that Plaintiff worked 35 hours a week at a job that was high stress and moderately physical.  Tr. at 366.  A cervical spine MRI conducted on November 4, 2004, showed C4–5 mild spinal stenosis and flattening of the cord more so on the left due to broad-based posterior disc osteophyte complex and focal left-sided disc herniation.  Tr. at 347–48.  At C5–6 there was a broad-

based disc osteophyte complex resulting in mild spinal stenosis and mild generalized flattening of the cord. *Id.* An MRI of the left shoulder showed degenerative change in the AC joint, but no evidence of a tear. Tr. at 349.

An x-ray of Plaintiff's left knee on January 31, 2005, showed mild degenerative changes, but no evidence of fracture. Tr. at 340. On March 15, 2005, a lumbar spine x-ray showed mild degenerative changes in the lower thoracic and lumbar spine. Tr. at 333. Plaintiff had periarticular sclerosis at the sacroiliac joints that was greater on the left. *Id.*

On October 31, 2005, Dr. Hanna noted that Plaintiff's post-concussion syndrome was improving and relieved by medication. Tr. at 376–77. He noted that symptoms of the condition were memory loss and paresthesias. Tr. at 376. At a November 2005 appointment, Plaintiff complained of aching and throbbing left knee pain likely due to arthritis that was improving and was relieved with ibuprofen. Tr. at 378. In January 2006, Plaintiff complained of worsening exhaustion, continued post-concussion syndrome, and improving left knee pain. Tr. at 380. On examination, she had tenderness to the right anterior lateral foot, no ankle deformity, and tenderness to right first toe joint. Tr. at 381. Plaintiff exhibited no obvious motor or sensory deficits and had a normal affect. *Id.*

In February 2006, Dr. Hanna noted Plaintiff suffered from stable hypothyroidism, post-concussion syndrome, and improved hypertension. Tr. at 382. On May 2, 2006, Plaintiff complained to Dr. Hanna of dizziness; however, she refused an MRI and wanted to "wait and see what happens." Tr. at 385–86. Approximately a week later, Plaintiff

reported worsening dizziness. Tr. at 387. On May 23, 2006, and June 13, 2006, Plaintiff's diabetes flared up, so Dr. Hanna changed her prescriptions. Tr. at 389–92. At a July 11, 2006 appointment, Dr. Hanna noted that Plaintiff's diabetes was improving. Tr. at 394.

On August 10, 2006, Plaintiff reported right shoulder pain that began one week prior and numbness in the left hand that begin months prior. Tr. at 395–97. On examination, she had a tender right shoulder, positive Tinel's sign in her left arm, and positive Phalen's test in her left arm. Tr. at 396. Assessment included carpal tunnel syndrome and pain in the joint involving the shoulder region. *Id.*

On December 18, 2006, Plaintiff complained of difficulty walking and bilateral leg and ankle pain that began two months prior. Tr. at 400. On examination, she exhibited no spinal tenderness, no joint swelling or deformity, tenderness to palpation of her right knee laterally, and painful extension of the right knee. Tr. at 401. She exhibited no obvious motor or sensory deficits. *Id.* She was prescribed Ultram and Voltaren. *Id.*

On December 21, 2006, Plaintiff was evaluated by Seth Kupferman, M.D., at South Carolina Sports Medicine and Orthopaedic Center for bilateral knee pain radiating proximally and distally. Tr. at 303–04. She reported mild persisting balance issues since her accident in 2004. Tr. at 303. She weighed 270 pounds. *Id.* She had a mild effusion in her knees that was greater on the right as well as pain with patellofemoral compression, pain with hyperflexion, and some lateral joint line tenderness on the right. *Id.* Dr. Kupferman noted there was no evidence of any ligamentous instabilities; a negative Lachman; negative pivot; negative anterior and posterior drawer; negative varus

or valgus laxity; normal step-off about both knees as well as negative patellar apprehension about both knees; no evidence of erythema, edema, or ecchymosis; and a negative straight leg raise bilaterally. *Id.* X-rays of both knees revealed moderate tri-compartmental changes and osteophyte formations tri-compartmentally. Tr. at 304. Plaintiff was assessed with bilateral knee osteoarthritis, advised to lose weight, and referred to physical therapy. *Id.*

Plaintiff followed up with Dr. Kupferman in February 2007 and noted that "she [was] feeling much better overall" and that she had no difficulty with any of the exercise programs at physical therapy. Tr. at 304. A physical examination revealed no effusion, pain free range of motion bilaterally, no pain with McMurray's testing or with hyperflexion, and no mechanical signs, but she did show some discomfort with compression. *Id.* Plaintiff had stopped taking pain medications, but continued to use Voltaren. *Id.*

On September 3, 2007, Plaintiff went to Bon Secours St. Francis Healthcare complaining of dizziness and an off-balance moment. Tr. at 309–20. Plaintiff noted that her pain level was a two out of ten and her psychological evaluation was normal. Tr. at 312. Plaintiff had a CT scan of her head which revealed hypodensity within the inferior right temporal lobe suggesting cerebral softening. Tr. at 318.

At Carolina Family Medicine on June 5, 2008, Plaintiff complained of worsening, intermittent leg and ankle pain that began two months prior to the visit. Tr. at 413. The associated symptoms were trouble walking, low back pain, swelling, and falling. *Id.* Dr. Hanna noted that Plaintiff's hypothyroidism and hypertension were stable and that she

7

had borderline controlled diabetes. *Id.* He also noted that Plaintiff had worsening memory loss or lack. Tr. at 414. Paintiff weighed 278 pounds and exhibited a tender left ankle and tender left wrist. Tr. at 414. On June 26, 2008, Plaintiff had a nerve conduction and limited EMG study of her left arm, which yielded normal results. Tr. at 450–51.

On July 3, 2008, examination revealed a tender left ankle and left wrist, but no edema and no obvious motor or sensory deficits. Tr. at 416–417. Assessment included worsening memory loss or lack, and Dr. Hanna noted that Plaintiff's left hand numbness was continuing and was relieved by nothing. *Id.* Plaintiff's left hand numbness continued to be constant on July 22, 2008, and Dr. Hanna prescribed Lyrica, Aricept, and Namenda. Tr. at 418–19.

On May 14, 2009, Plaintiff sought follow-up for aching all over. Tr. at 429. She stated that it began two months prior to the appointment and characterized it as burning, excruciating pain that was worsening. *Id.* She said it was aggravated by walking, going up and down stairs, and prolonged sitting and standing, and was very slightly relieved with Motrin 800 mg. *Id.* She reported falling three times because her legs would not support her. *Id.* On examination, she was in no distress, had no edema or obvious motor or sensory deficits, and exhibited a normal affect. Tr. at 430. Dr. Hanna prescribed Pamelor and Zanaflex. *Id.*

Plaintiff returned to Dr. Hanna on June 11, 2009, for follow-up and reported aching all over that began three months prior. Tr. at 352. She described it as burning, excruciating pain that worsened with walking or prolonged standing or sitting and

associated it with low back pain and three falls. *Id.* Dr. Hanna noted that Plaintiff's myalgia was improving and continued treatment with two prescriptions. Tr. at 353.

On August 20, 2009, Dr. Cashton B. Spivey, Ph.D., performed a psychological consultative examination of Plaintiff. Tr. at 479–82. Plaintiff reported significant spinal and leg pain, problems with her left hand, hypothyroidism, headaches, and memory deficits. Tr. at 479. She said she was capable of bathing and dressing independently, cooking simple meals, driving, reading a newspaper, and performing simple arithmetic calculations. Tr. at 480. Plaintiff obtained a score of 27 out of a possible 30 points on the mini-mental status examination; was oriented to time, place, and person; was unable to perform serial 7s; was able to spell the word "world" backwards; recalled one of three objects at five minutes, which suggested possible mild impairment in her short-term auditory memory; demonstrated intact language skills; was able to follow a three-step command, but was unable to accurately reproduce a drawing; and demonstrated a satisfactory general fund of information and intact abstract reasoning abilities. Tr. at 480-81. Plaintiff had fair to good insight and judgment, and Dr. Spivey estimated that she fell in the average range of general intelligence. Tr. at 481. Dr. Spivey diagnosed Plaintiff with anxiety disorder (with a rule out diagnosis of depressive disorder), and assessed a Global Assessment of Functioning ("GAF")[2] score of 55. *Id.*

On September 3, 2009, Dr. Michael Neboschick, Ph.D., completed a psychiatric review technique of Plaintiff. Tr. at 483–96. Dr. Neboschick found that Plaintiff had no

---

[2] "Clinicians use a GAF to rate the psychological, social, and occupational functioning of a patient." *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 597 n. 1 (9th Cir. 1999).

restrictions of activities of daily living ("ADLs"); no difficulties in maintaining social functioning; mild difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation.  Tr. at 493.  Dr. Neboschick concluded as follows: "In summary the cl[aimant]'s allegations are not supported by the evidence.  She is not and has not been in any [mental health treatment].  Her [symptoms] did not lead to a [diagnosis] of depression, only a [rule out diagnosis].  There was no severity of cognitive limitations.  Her ADLs are intact.  She is working part time. [. . .]"  Tr. at 495.

On September 8, 2009, Dr. William F. Maguire, Jr., M.D., performed a physical consultative examination of Plaintiff.  Tr. at 498–501.  Plaintiff reported pain in the ankles, knees, low back, neck, and left shoulder as well as decreased sensation in the left hand up to the elbow.  Tr. at 498.  She reported some decreased memory, balance, and vision.  *Id.*  Dr. Maguire noted that Plaintiff appeared in no acute distress and was able to get "[. . .] on and off the exam table without any particular problem and also walks with no apparent limp or trouble with her ambulation."  Tr. at 499.  He further noted some decreased sensation in Plaintiff's left hand up to the level of the elbow, but that otherwise, her sensory function in her face and extremities was normal.  *Id.*  Plaintiff's motor function in her face and extremities were also normal.  *Id.*  The doctor reported that her cerebellar function by finger-to-nose as well as gait observations were all normal.  *Id.*  Dr. Maguire found that Plaintiff's deep tendon reflexes were symmetrical and normal and that Plaintiff had no tenderness across the neck or the low back.  Tr. at 500.

During the physical examination, Dr. Maguire also noted there was no straight leg raising pain, sitting or supine, and examination of her knees and ankles revealed the joints

to be intact. *Id.* There was no evidence of instability, effusion, or tenderness. *Id.* Dr. Maguire found Plaintiff had a limited range of motion in the lumbar spine, but normal range of motion of the cervical spine. *Id.* Dr. Maguire observed that Plaintiff was unable to tandem walk, heel to toe walk or squat; however, she had no gait disturbance and did not use a cane. *Id.* He reported that the only sensory loss was in the left hand and lower arm, with no joint abnormalities, reflex problems, or atrophy. *Id.* Dr. Maguire opined that Plaintiff's leg, back, and neck pain would limit her ability to carry out strenuous activities. *Id.* He further opined that neither the decreased sensation in the left hand nor the sensitivity across her left flank appeared to be disabling. *Id.* He observed that Plaintiff's balance and vision seemed normal as did her memory for simple conversation. Tr. at 500–01. He noted that he did not specifically test Plaintiff's memory, but reported that during their half hour conversation, she had no trouble remembering things they were talking about. Tr. at 501.

Plaintiff had a series of x-rays on October 8, 2009, including a lumbar spine study, which revealed mild degenerative changes of the sacroiliac joints and both hips, facet arthropathy of the lumbar spine most notable at L3–4 through L5–S1, and multilevel small Schmorl's nodes; a shoulder study, which revealed remote trauma of an old fracture of the scapula and probable old healed impaction injury of the greater tuberosity, with no fracture line seen; and a hand study, which revealed mild degenerative change of the left wrist. Tr. at 503–05.

On October 14, 2009, Dr. Jean Smolka, M.D., prepared a physical residual functional capacity ("RFC") assessment of Plaintiff finding that she could occasionally

lift and/or carry 20 pounds; frequently lift and/or carry 10 pounds; and stand, walk, and/or sit (with normal breaks) for a total of about six hours in an eight-hour workday. Tr. at 507.  Dr. Smolka limited Plaintiff to occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling; never climbing ladders, ropes or scaffolds; occasional reaching overhead bilaterally; frequent, but not continuous, handling on the left; never handling very hot or cold materials; and avoiding all exposure to hazards.  Tr. at 508–10.  Dr. Smolka found that "total evidence indicates that the claimant would be capable of at least light work."  Tr. at 513.

On October 15, 2009, and October 19, 2009, Plaintiff had lumbar and cervical MRIs along with a brain MRI.  Tr. at 514–18.  The lumbar MRIs showed areas of perifacet and marginal disc enhancement most impressive in the left L4–5 left neuroforamen associated with a superior extrusion affecting the exiting left L4.  Tr. at 514.  The MRIs also demonstrated caudal spondylosis most impressive at L4–5 where left intra-to-extraforaminal shallow extrusion caused contact and slight deflection exiting left at L4 and tiny synovial cyst contributing to moderate central canal stenosis.  Tr. at 516.  A cervical MRI revealed C4–5 left paracental protrusion causing severe central stenosis and significant cord effect.  Tr. at 515.  A second cervical MRI showed C4–5 focal central to left paracentral protrusion causing severe central stenosis, moderate to severe left hemicord flattening, and focal increase in cord signal at the site of maximal stenosis.  Tr. at 517.  The brain MRI showed a 4.4 cm parenchymal defect and underlying gliosis in the anterolateral right temporal lobe, likely representing a prior infarct, with internal linear residual vasculature versus parenchyma.  Tr. at 518.  A 2 cm focal cortical

infarct in the posterior right temporal lobe and bilateral small chronic lacunar infarcts were also present. *Id.*

On October 26, 2009, Plaintiff saw Stephen E. Rawe, M.D., Ph.D., a neurosurgeon, complaining of numbness in her right arm and feet, and neck and back pain, which developed while she was driving on October 2, 2009. Tr. at 569–70. Dr. Rawe noted Plaintiff had features consistent with possible myelopathy and radiculopathy as well as possible lumbar radiculopathy. Tr. at 570. He further noted that MRI scans indicated a fairly large central cervical disk herniation asymmetric to the left that was most likely responsible for the majority of her symptoms including feelings of weakness and heaviness in her legs and bilateral numbness of the arms and legs. *Id.* He stated that the disk herniation likely was not responsible for any leg or back discomfort. *Id.* Dr. Rawe presented treatment options to Plaintiff including surgery, conservative therapy, and steroid injections. *Id.*

Plaintiff elected surgery and on November 3, 2009, she underwent a successful spinal fusion performed by Dr. Rawe. Tr. at 522. On January 21, 2010, Plaintiff had a post-operation follow-up appointment with Dr. Rawe and reported that she felt great and had no weakness or sensory abnormalities. Tr. at 578. Dr. Rawe noted that the numbness in Plaintiff's legs and arms had resolved and that she had good strength in both upper extremities. *Id.*

On July 27, 2010, Dr. Olin Hamrick, Jr., Ph.D., reviewed the medical evidence of record and affirmed Dr. Neboschick's November 2009 psychiatric review technique. Tr. at 579. That same day, Dr. Cleve Hutson, M.D., completed an RFC assessment and

13

found that Plaintiff was reasonably capable of a sustained level of light exertion with no further limitations.  Tr. at 580–87.

    C.    The Administrative Proceedings

        1.    The Administrative Hearing

At the hearing on June 10, 2011, Plaintiff testified that she lived with her husband, mother, four children, and two nephews.  Tr. at 30.  She stated that she was in a car accident in 2004.  Tr. at 33.  She said she attempted to work in 2005, but was unable to do filing because she had issues trying to remember accounts.  *Id.*  She stated that in 2006, she began answering phones at her church a couple of hours each day, but that they understood if she was not able to come to work.  Tr. at 34.

Plaintiff testified that she had pain in her head, neck, back, and legs that got progressively worse each year following her car accident.  Tr. at 33.  She said she had back surgery in 2009 that helped tremendously and permitted her to return to full-time work.  Tr. at 34.  She testified that, prior to surgery, she did not want to undergo injections to treat her pain.  Tr. at 39.  She stated that she continued to have some difficulty with her short-term memory.  Tr. at 34–35, 38.

Plaintiff said that for nine or ten months following her car accident, she had poor balance, could not sit for longer than 45 minutes or stand for longer than 20 minutes, and had memory problems.  Tr. at 35.  She stated she could not walk up stairs for about a year and a half.  Tr. at 36.  She said she had trouble sleeping.  Tr. at 37.

2.      The ALJ's Findings

In his decision dated June 23, 2011, the ALJ made the following findings of fact

and conclusions of law:

1.      The claimant meets the insured status requirements of the Social Security Act through March 31, 2014.

2.      The claimant did not engage in substantial gainful activity from July 22, 2005 to January 21, 2010 (20 CFR 404.1571 *et seq.*).

3.      From July 22, 2005 to January 21, 2010, the claimant had the following severe impairments: status post motor vehicle accident with concussive syndrome, a cognitive disorder, degenerative disc disease, degenerative joint disease, and obesity (20 CFR 404.1520(c)).

4.      During the period from July 22, 2005 to January 21, 2010, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.      After careful consideration of the entire record, the undersigned finds that from July 22, 2005 to January 21, 2010, the claimant had the residual functional capacity to perform the full range of unskilled sedentary work as defined in 20 CFR 404.1567(a). Specifically, the claimant was able to lift and carry up to 10 pounds occasionally and less amounts frequently, sit for 6 hours in an 8-hour day, and stand and walk occasionally. Such a residual functional capacity is well supported by the weight of the evidence of record.

6.      From July 22, 2005 to January 21, 2010, as a result of her residual functional capacity as described above, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7.      The claimant was born on September 20, 1966 and was a younger individual age 18–44, during the requested closed period. (20 CFR 404.1563).

8.      The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9.      Transferability of job skills is not material to the determination of disability because applying the Medical-Vocational Rules directly supports a finding of "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed from July 22, 2005 to January 21, 2010 (20 CFR 404.1569 and 404.1569(a)).

11.     The claimant was not disabled, as defined in the Social Security Act, from July 22, 2005 to January 21, 2010 (20 CFR 404.1520(g)).

Tr. at 14–22.

II.    Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)    the ALJ's step three analyses failed to comply with the requirements of substantial evidence; and

2)    substantial evidence does not support the ALJ's findings at steps four and five of the sequential evaluation process.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.    Legal Framework

1.    The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability."  42 U.S.C. § 423(a).  Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions.  *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims).  An examiner must consider the following:  (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that

16

impairment meets or equals an impairment included in the Listings;[3] (4) whether such impairment prevents claimant from performing PRW;[4] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

---

[3] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[4] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is

supported by substantial evidence.  "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005).  Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational.  *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964).  If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision."  *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    RFC Assessment

Plaintiff asserts that the ALJ's RFC assessment is not supported by substantial evidence because he did not properly take into account her mental impairments.  [Entry #15 at 14–16].  Specifically, Plaintiff argues that the ALJ's RFC determination is flawed because it fails to consider her nonexertional impairments of dizziness, disorientation, memory loss, and fatigue.  *Id.* at 16.  Plaintiff further argues that the ALJ failed to provide the narrative required by SSR 96-8p in support of the RFC determination.  *Id.* The Commissioner responds that the ALJ provided an adequate narrative discussion. [Entry #19 at 27].

The ALJ's RFC assessment should be based on all the relevant evidence.  20 C.F.R. §§ 404.1545(a).  Social Security Ruling 96–8p requires that the RFC assessment "include a narrative discussion describing how the evidence supports each conclusion,

citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96–8p. The RFC must "first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis . . . ." *Id.* The ALJ must discuss the claimant's ability to work in an ordinary work setting on a regular work schedule. *Id.*

Plaintiff's allegation of error rests primarily upon the ALJ's failure to address the nonexertional effects of her brain injuries. At the hearing, Plaintiff testified that she continued to have some difficulty with her short-term memory. Tr. at 34–35, 38. Following her discharge from Health South in August 2004, Plaintiff underwent three therapy sessions for memory and word retrieval. Tr. at 254. Upon discharge from therapy on September 7, 2004, her specific naming was 80%, short term memory was 78%, and working memory was 64%. *Id.* The medical records demonstrate that Plaintiff routinely reported memory loss to her treating physician. *See* Tr. at 376, 414, 416. In her consultation with Dr. Spivey on August 20, 2009, Dr. Spivey noted that Plaintiff recalled one of three objects at five minutes, which suggested possible mild impairment in her short-term auditory memory. Tr. at 480. Thus, over five years after her accident, Plaintiff continued to exhibit problems with her memory.

In his RFC assessment, the ALJ acknowledged that Plaintiff suffered from a cognitive disorder and a post-concussive syndrome following her accident in 2004. Tr. at 19. The ALJ noted, however, that Plaintiff required no specialized care for her mental condition during the relevant time period. *Id.* He also noted that records documented no speech deficits, no more than mild persisting balance issues, and no focal coordination

deficits.  *Id.*  The ALJ summarized Dr. Spivey's findings, including his finding that Plaintiff's recall ability indicated a possible mild impairment of her short-term auditory memory.  *Id.*  The ALJ referenced Dr. Maguire's September 2009 consultative examination  and stated that the examination "revealed intact balance, a normal memory, and normal neurological findings."  *Id.*  Based on this evidence, the ALJ gave Plaintiff "the absolute benefit of the doubt" and limited her to unskilled work during the closed period at issue.  *Id.*

The undersigned recommends finding that the ALJ did not provide adequate discussion of Plaintiff's alleged memory problems and that his RFC determination is not supported by substantial evidence.  The ALJ's reliance on Dr. Maguire's finding of "a normal memory" is misplaced because the doctor specifically noted that he did not test Plaintiff's memory.  Tr. at 501.  Dr. Maguire observed that Plaintiff's memory for conversation seemed normal, but this was based solely on their half hour conversation and not on any testing.  Tr. at 500–01.  Dr. Spivey's testing, however, revealed a possible mild-impairment of Plaintiff's short-term auditory memory.   Dr. Spivey's report, combined with Plaintiff's repeated complaints of memory difficulties, is sufficient to establish the existence of a nonexertional impairment of memory problems.  The ALJ apparently recognized this when he found Plaintiff's concussive syndrome and cognitive disorder to be severe impairments.  Tr. at 15.  Limiting Plaintiff to unskilled work does not properly account for Plaintiff's memory problems, and the ALJ did not explain why he found that these problems did not impact Plaintiff's ability to perform unskilled work.

Based on the foregoing, the undersigned recommends remanding this matter to the ALJ for further consideration of Plaintiff's RFC, specifically including additional consideration of her alleged nonexertional impairments.

2.     Reliance on the Grids

Plaintiff also argues that the ALJ erred in failing to obtain the testimony of a vocational expert ("VE"). [Entry #15 at 17]. The Commissioner contends that the ALJ properly relied on the Medical-Vocational Guidelines (the "Grids"), 20 C.F.R. Part 404, Subpart P, Appendix 2, to find Plaintiff not disabled because substantial evidence supports the ALJ's finding that Plaintiff retained the RFC to perform the full range of unskilled work without any nonexertional limitations. [Entry #19 at 32].

The Grids consider only the exertional component of a claimant's disability in determining whether jobs exist that the claimant is able to perform in spite of her disability. *See Walker v. Bowen*, 889 F.2d 47, 49 (4th Cir. 1989). "Exertional limitations" exist "[w]hen the limitations and restrictions imposed by [the claimant's] impairment(s) and related symptoms, such as pain, affect only [her] ability to meet the strength demands of jobs (sitting, standing, walking, lifting, carrying, pushing, and pulling)." 20 C.F.R. § 404.1569a(b). A nonexertional limitation "is a limitation that is present whether the claimant is attempting to perform the physical requirements of the job or not, such as mental retardation, mental illness, blindness, deafness or alcoholism" and is "present at all times in a claimant's life, whether during exertion or rest." *Gory v. Schweiker*, 712 F.2d 929, 930 (4th Cir. 1983) (footnotes omitted). A nonexertional limitation does not directly affect the claimant's exertional abilities—the ability to sit,

22

stand, walk, lift, carry, push, or pull; rather, nonexertional limitations affect the mind, vision, hearing, and use of the body to climb, balance, stoop, kneel, crouch, crawl, reach, handle, and use the fingers for fine activities.  *See* 20 C.F.R. § 404.1569a(c).  "Thus, it is the nature of the claimant's limitations, not certain impairments or symptoms, that determines whether the claimant will be found to have only exertional limitations or restrictions, only nonexertional limitations or restrictions, or a combination of exertional and nonexertional limitations or restrictions."  SSR 96–9p.

When a claimant suffers from a nonexertional impairment that restricts her ability to perform work of which she is exertionally capable, the ALJ may not rely exclusively on the Grids to establish that the claimant could perform other work that exists in the national economy.  *See Walker*, 889 F.2d at 49; *Coffman v. Bowen*, 829 F.2d 514, 518 (4th Cir. 1987) ("When nonexertional limitations . . . occur in conjunction with exertional limitations, the guidelines are not to be treated as conclusive." (citing *Roberts v. Schweiker*, 667 F.2d 1143, 1145 (4th Cir. 1981); 20 C.F.R. Pt. 404, Subpt. P, App. 2 § 200.00(a), (d)-(e)(2); 20 C.F.R. § 404.1569)); *Hammond v. Heckler*, 765 F.2d 424, 425–26 (4th Cir. 1985) ("[T]he grids inadequately describe[ ] the claimant who suffers a disability present in the absence of physical exertion."); 20 C.F.R. § 404.1569a(d).  Rather, in those circumstances, the Commissioner has the burden to prove by expert vocational testimony—not exclusive reliance on the Grids—that, despite the claimant's combination of exertional and nonexertional impairments, specific jobs exist in the national economy that the claimant can perform.  *Grant v. Schweiker*, 699 F.2d 189, 192 (4th Cir. 1983).

In finding Plaintiff capable of performing the full range of unskilled, sedentary work, the ALJ considered her age, education, and work experience, in conjunction with the Grids. Tr. at 22. The ALJ concluded that Medical-Vocational Rule 201.28 directed a finding of "not disabled." *Id.* However, as noted above, the ALJ failed to adequately address Plaintiff's alleged nonexertional limitations that could potentially affect her ability to perform a full range of sedentary work and foreclose sole reliance on the Grids. Because the ALJ did not adequately explain the basis for his RFC determination with regard to Plaintiff's alleged nonexertional impairments, the undersigned is unable to determine whether the ALJ properly relied on the Grids. For this reason, the undersigned recommends that the matter be remanded for further consideration of the necessity of a VE.

### 3. Remaining Allegations of Error

In light of the foregoing recommendations related to the ALJ's incomplete consideration of Plaintiff's alleged nonexertional impairments, Plaintiff's remaining allegations of error are not addressed. On remand, however, the undersigned recommends directing the ALJ to provide greater explanation regarding his consideration of Plaintiff's cervical spine impairment and Listing 12.02. The undersigned further recommends directing the ALJ to consider Plaintiff's alleged nonexertional impairments in combination with her other impairments. The undersigned notes that the ALJ did not err in considering Plaintiff's ADLs in determining her RFC, but must also provide additional factors supporting his RFC finding on remand. The undersigned notes that the

recommendations in this matter are in no way intended to suggest that the ALJ should award benefits on remand.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

*Shiva V. Hodges*

June 12, 2014                          Shiva V. Hodges
Columbia, South Carolina               United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see*  Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).